UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

KAREN FACCIOLO, as Administrator
of the Estate of BRUNO FACCIOLO,
and KAREN FACCIOLO a/k/a KAREN          OPINION
CARGILL and ROSEANN LIPARI
Individually,                           Civil Action No.
                                        CV-09-1332 (DGT)(JMA)

        Plaintiffs,

    v.

THE CITY OF NEW YORK, THE NEW
YORK CITY POLICE DEPARTMENT,
STEPHEN CARACAPPA, and LOUIS
EPPOLITO,

        Defendants.

------------------------------X

Trager, J:


        Plaintiffs, Karen Facciolo ("Karen"), as Administrator of

the Estate of Bruno Facciolo ("Bruno") and in her individual

capacity, and Roseann Lipari ("Lipari"), bring this action

against defendants the City of New York ("the City"), the New

York City Police Department ("the NYPD"), Stephen Caracappa

("Caracappa") and Louis Eppolito ("Eppolito") (collectively,

"defendants").  Plaintiffs' allegations stem from the 1990

murder of Bruno Facciolo, husband to Karen and father to Lipari.

Defendants Eppolito and Caracappa – both former NYPD detectives

– have since been convicted of various federal crimes for, _inter

alia_, their participation in Bruno's murder.  Plaintiffs now

allege, under 42 U.S.C. § 1983, that Eppolito and Caracappa's roles in the murder of Bruno amount to violations of plaintiffs' and decedent's constitutional rights, including their right to due process. Plaintiffs further assert the City's and the NYPD's liability for these violations upon the theory that grossly reckless or inadequate agency policies and supervision contributed to Caracappa and Eppolito's actions. Finally, plaintiffs allege state law claims of wrongful death and negligent injury against all defendants.

The City and the NYPD (together, "City defendants") have moved for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), arguing that plaintiffs have failed to state a claim upon which relief may be granted. For the reasons explained below, City defendants' motion – which is converted into a motion for summary judgment – is granted.

## Background

### (1)

The following facts are taken from plaintiffs' complaint and the supporting materials submitted by the parties. On or about August 24, 1990, defendants Caracappa and Eppolito, then members of the NYPD, illegally used a confidential NYPD database to determine that Bruno Facciolo was planning on cooperating with the government against members of organized crime. Compl.

¶¶ 2, 18.  Caracappa and Eppolito then informed Anthony Casso ("Casso"), a high-ranking member of an organized crime family in New York City, of Bruno's intention.  Id. ¶¶ 16, 19.  Acting upon this information, Casso ordered that Bruno be murdered.  Id. ¶ 20.  Bruno's body was found on August 30, 1990 with multiple stab and gunshot wounds.  Id. ¶ 14.

Approximately fifteen years later, on March 10, 2005, Caracappa and Eppolito were indicted on racketeering and conspiracy charges stemming from their assistance to organized crime families over the years.  Id. ¶ 28-29.  Until this point, the Facciolo family had no reason to know that Caracappa and Eppolito had any involvement in Bruno's death.  Id. ¶ 30.  However, the indictment clearly brought to light these defendants' role in Bruno's murder: among the charges of racketeering activity leveled against Caracappa and Eppolito was one count of criminal facilitation of the murder of Bruno Facciolo.  See id. ¶ 28; see also United States v. Eppolito, 436 F. Supp. 2d 532, App. A (E.D.N.Y. 2006) (superseding indictment attached as appendix to opinion), rev'd, 543 F.3d 25 (2d Cir. 2008).

This indictment and the subsequent trial were widely publicized in the news media.  See App. to City Defs.' Mem. Supp. Mot. J. Pleadings ("Defs.' App.") (appending one dozen related newspaper articles).  Just over a year later, on April 6, 2006,

3

Caracappa and Eppolito were convicted on all counts, including conspiracy to murder Bruno Facciolo. Compl. ¶ 22.

Plaintiffs began to consider taking action against the City for its possible role in Bruno's murder as early as summer 2006. Plaintiffs' previous law firm, the Cochran Firm, filed a Notice of Claim – a state law prerequisite to suing a city under certain causes of action – against the City on July 3, 2006, on behalf of plaintiffs. Aff. Roseann Lipari ("Lipari Aff.") ¶ 4. This Notice of Claim sought damages for, <u>inter alia</u>, the wrongful death of Bruno "as a result of the negligence, gross negligence, recklessness, carelessness and wrongful conduct of The City of New York and the New York City Police Department . . . for failing to properly supervise and train Louis J. Eppolito and Stephen Caracapa [sic]." Decl. Michael Chestnov Supp. City Defs.' Mot. J. Pleadings, Ex. E ("Notice of Claim") at 1. The Notice of Claim explained that it was filed in 2006 because it was not until Eppolito and Caracappa's convictions on April 6, 2006, that plaintiffs had the information necessary to formulate a claim against the City. <u>See</u> <u>id.</u>

However, after filing this Notice of Claim, the Cochran Firm informed Lipari that it "did not see a case" against the City.[1] Lipari Aff. ¶ 5. Having received this advice, plaintiffs

_____

[1] It is somewhat strange that the Cochran firm counseled plaintiffs that it "did not see a case" at this point. Numerous

4

did nothing to pursue any claims over the next three years. Then, on March 5, 2009, Lipari and her husband read in the newspapers that Benjamin Brafman ("Brafman") was suing the City on behalf of another family in similar circumstances to the Facciolos.  Id. ¶ 6.  Realizing anew that the Facciolo family might also have a viable claim, Lipari's husband contacted Brafman, who referred Lipari to Saul Bienenfeld ("Bienenfeld"). Id. ¶ 7.  On March 17, 2009, plaintiffs met with Bienenfeld in his office and "for the first time" learned that the City was responsible for Bruno's death due to the fact that the City knew or should have known that Caracappa and Eppolito had connections to organized crime at the time they were given access to confidential information.  Id. ¶¶ 8-9.

Based on this new knowledge, plaintiffs filed the instant complaint on March 31, 2009.  In it, plaintiffs allege that City defendants were aware of Caracappa and Eppolito's connections to organized crime while they were employed as members of the NYPD.

---

other persons who had family members murdered through information supplied by Caracappa and Eppolito had already filed suit against the detectives and the City by this time, alleging, inter alia, violations of their constitutional rights under § 1983 on the same theory the Facciolos are now pursuing.  See, e.g., Pipitone v. City of New York, No. 06-cv-145, ECF No. 1 (E.D.N.Y.) (complaint filed January 12, 2006); Di Lapi v. City of New York, No. 06-cv-3101, ECF No. 1 (E.D.N.Y.) (complaint filed June 22, 2006); Greenwald v. City of New York, No. 06-cv-2864, ECF No.1 (E.D.N.Y.) (complaint filed June 7, 2006); Borrielo v. City of New York, No. 06-cv-2954, ECF No. 1 (E.D.N.Y.) (complaint filed June 14, 2006).

In support, the complaint notes that Eppolito was suspended from the department in 1984 for possible organized crime-related corruption.  Id. ¶ 24.  Nevertheless, Caracappa and Eppolito were allowed continued access to confidential NYPD information regarding organized crime investigations.  Id. ¶ 23-24.  On the basis of these facts, the complaint alleges that inadequate NYPD policies enabled Caracappa and Eppolito's actions.  Id. ¶ 23-25.

City defendants filed an Answer on June 24, 2009.  They then filed a motion for judgment on the pleadings on October 16, 2009.  In it, they argue: (1) plaintiffs' claims under 42 U.S.C. § 1983 are barred by the applicable statute of limitations; (2) plaintiffs' state law claims against the City are barred because plaintiffs did not timely file a notice of claim and did not timely commence suit; and (3) the NYPD is not a suable entity.  As explained below, City defendants are correct on all three points, and, therefore, their motion is granted in its entirety.

## Discussion

### (1)

### Conversion of the Motion and Governing Standards

Before turning to the merits of plaintiffs' claims, it must be determined how to treat the instant motion.  Although City defendants moved for judgment on the pleadings, both parties

have presented matters outside the pleadings for consideration. Because these materials are considered in ruling on the instant motion, the motion will be converted into a motion for summary judgment. See Fed. R. Civ. P. 12(d) (stating that a motion for judgment on the pleadings under Rule 12(c) should be converted into a motion for summary Judgment under Rule 56 and treated as such "if . . . matters outside the pleadings are presented to and not excluded by the court"). Of course, a motion for judgment on the pleadings cannot be converted into a motion for summary judgment unless notice is given to the parties before conversion. See Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999). However, this notice requirement is "simply an application . . . of the principle that parties are entitled to a reasonable opportunity to present material pertinent to a summary judgment motion," and "compliance is not an end in itself." Id. (internal marks omitted). Thus, a party is considered to have notice that a conversion might occur if the party "should reasonably have recognized [such a] possibility." Sira v. Morton, 380 F.3d 57, 68 (2d Cir. 2004) (quoting Gurary, 190 F.3d at 43).

In this case, by including an affidavit with their opposition papers and by explicitly recognizing the possibility of conversion in those papers, plaintiffs should have been aware of the likelihood of conversion. See Gurary, 190 F.3d at 43

(motion to dismiss properly treated as one for summary judgment when plaintiff submitted an affidavit in opposition to motion to dismiss).  Indeed, the Second Circuit has explained that it might be error for a district court to decline to convert a motion in order to consider a plaintiff's affidavit submitted in opposition to a motion to dismiss.  See id. (finding, when plaintiff submitted an affidavit along with opposing papers, that he not only "invited [the district court judge] to rely not only upon the complaint," but that the district court might have erred had it declined the invitation).  Accordingly, the notice requirement is satisfied in this case and the motion is converted into one for summary judgment.

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact . . . ."  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, all evidence is construed in favor of the non-moving party and all reasonable inferences are drawn in its favor.  Paige v. Police Dep't of Schenectady, 264 F.3d 197, 199 (2d Cir. 2001).

## Claims Against the New York City Police Department

It is easiest to begin with City defendants' final argument, that the NYPD is not a suable entity. Under the New York City Charter, "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." New York, N.Y., Charter ch. 17, § 396 (2010). Thus, as a municipal agency, the NYPD is not a "properly named part[y] in a lawsuit." See Robinson v. Matos, No. 97-CV-7144, 1999 WL 225938, at *1 (S.D.N.Y. April 19, 1999); Jenkins v. City of New York, 478 F.3d 76, 93 n.19 (2d Cir. 2007) ("[T]he NYPD is a non-suable agency of the City."). Accordingly, the NYPD is dismissed from this action, and further discussion will focus solely on plaintiffs' claims against the City.


**( 3 )**

## Statute of Limitations

Plaintiffs' first claim against the City is brought pursuant to 42 U.S.C. § 1983, for violations of their constitutional rights. As established in Monell v. Department of Social Services, 436 U.S. 658 (1978), "[i]n order to sustain

a claim for relief under 42 U.S.C. § 1983 against a municipal defendant, the plaintiff must show the existence of an officially adopted policy or custom that caused injury and a causal connection between that policy or custom and the deprivation of a constitutional right." DeVito v. Inc. Vill. of Valley Stream, 991 F. Supp. 137, 140 (E.D.N.Y. 1998) (internal quotation marks omitted); see also Monell, 436 U.S. at 694. At least at this stage, the City does not argue that plaintiffs have failed to adequately allege an official City policy or custom as a cause of Bruno's death. It will thus be assumed for purposes of this motion that plaintiffs' allegations are, in this respect, adequate.

The City's primary argument is that plaintiffs' claims under 42 U.S.C. § 1983 are barred by the statute of limitations. Because § 1983 does not have its own limitations period, federal courts borrow the "general or residual [state] statute [of limitations] for personal injury actions" from the state in which they sit. Ormiston v. Nelson, 117 F.3d 69, 71 (2d Cir. 1997) (alterations in original) (citing Owens v. Okure, 488 U.S. 235, 249-50 (1989)). Thus, in New York, claims under § 1983 must be brought within three years. See id.; see also N.Y. C.P.L.R. § 214(5) (McKinney's 2010).

However, federal law governs the issue of when the statute of limitations begins to accrue for § 1983 purposes. See Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002); Ormiston, 117 F.3d at 71. Federal law holds that the statute of limitations accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action." Pearl, 296 F.3d at 80, 85. This concept of accrual is often referred to as the "discovery rule." Id. at 80.

Based on this "discovery rule" of accrual, the City believes that plaintiffs' claims accrued in 1990, at the time plaintiffs learned of Bruno's murder. Plaintiffs argue, in response, that the "injury" they suffered here was not Bruno's murder, but rather the realization that this murder stemmed from the City's inadequate supervision of its corrupt detectives. Plaintiffs' argument has some force, but ultimately cannot save their § 1983 claim.

The Second Circuit has recognized that the discovery rule is not always the appropriate accrual rule for Monell claims, which sometimes accrue later than the underlying injury. Specifically, it has explained that "[s]ince an actionable claim under § 1983 against a county or municipality depends on a harm stemming from the municipality's 'policy or custom,' a cause of action against the municipality does not necessarily accrue upon

the occurrence of a harmful act, but only later when it is clear, or should be clear, that the harmful act is the consequence of a county 'policy or custom.'" <u>Pinaud v. Cnty. of Suffolk</u>, 52 F.3d 1139, 1157 (2d Cir. 1995) (internal citation omitted). This rule has been labeled as a "delayed accrual theory," under which a plaintiff's § 1983 claim against a municipality does not accrue until he "knew about, or at least had reason to come to know about, the policy or custom" upon which he bases his claim. <u>Id.</u>; <u>see also</u> <u>Damino v. City of New York</u>, 99-CV-3638, 2004 WL 2032515, at *5-6 (E.D.N.Y. Sept. 13, 2004) (Trager, J.) ("[A] § 1983 cause of action against a municipality accrues when the plaintiff knew or should have known enough to claim the existence of a policy or custom so that he could sue the municipality." (internal marks omitted)); <u>Ruiz v. Suffolk Cnty. Sheriff's Dep't</u>, 03-CV-3545, 2008 WL 4516222, at *2 (E.D.N.Y. Oct. 2, 2008) (same).

This delayed accrual theory seems designed for situations similar to the present one. Although plaintiffs knew of the underlying injury – Bruno's murder – as of 1990, no facts have been presented to suggest they had any way of knowing of defendants' involvement in the murder at that time. It was not until Carracapa and Eppolito were indicted, fifteen years later, that plaintiffs possibly could have known that the NYPD or the City might have had some ties to Bruno's murder.

However, just as in _Pinaud_, where the Second Circuit recognized the possibility of delayed accrual in theory but rejected it in application, the delayed accrual theory does not help plaintiffs here. See _Pinaud_, 52 F.3d at 1157. Plaintiffs believe that the date of accrual in their case should be the date plaintiffs first learned of their potential _Monell_ claim against the City, which plaintiffs argue was upon consulting with their current counsel on March 17, 2009. As plaintiffs explain it, this meeting gave them the "new knowledge" that they might have a claim against the NYPD and the City based on the theory that City defendants knew of Caracappa and Eppolito's organized crime ties but continued to allow them access to sensitive and confidential information. However, although this may be the day plaintiffs actually learned of this specific claim against the City, it certainly cannot be said to be the date that plaintiffs "had reason to come to know about" their claim. Cf. _id._

To the contrary, the facts which form the basis of plaintiffs' claims were available from the time of Carracappa and Eppolito's indictment on March 10, 2005. Indeed, plaintiffs' complaint concedes that they were aware of the indictment and the fact that it implicated Caracappa and Eppolito in Bruno's murder. See Compl. ¶ 30 ("From August 24, 1990 until the United States Attorneys [sic] Office announced

the indictment of the defendants, the Facciolo family had

neither knowledge nor reason to know that the defendants had any

involvement in the death of their father . . . ."). Certainly

then, based on the information in the indictment implicating

Caracappa and Eppolito in Bruno's murder, plaintiffs' claims

against these defendants accrued at this time.

The only way in which plaintiffs' claims against the City

might not also have accrued at this time is if, in spite of the

indictment, they still could not have known the critical

information necessary to bring a claim against the City based on

a "custom or policy." Cf. Pinaud, 52 F.3d at 1157. Plaintiffs'

current Monell claim rests on the premise that the City's

policies were inadequate because the City allowed detectives

known to have possible organized crime ties to continue to

access sensitive NYPD information. The critical facts necessary

to formulate this claim would thus be facts tending to show that

the NYPD had some knowledge of Carracapa and Eppolito's

organized crime ties prior to or during the period where these

detectives were selling confidential NYPD information.

Therefore, perhaps if it were the case that such information

emerged only during Caracappa and Eppolito's trial, plaintiffs

might have an argument that the date of accrual for their claims

against the City should be as late as April 2006.[2]  This accrual

date might make their March 2009 complaint timely under the

applicable three year statute of limitations.  However,

plaintiffs present no argument or evidence to this effect.

Instead, the record reflects the opposite: the City's

possible liability was readily ascertainable at the time of the

indictment in March 2005.  The indictment itself specified that

Caracappa and Eppolito were being prosecuted for "[s]elling

information obtained from sensitive law enforcement records,

witnesses, files and facilities . . . ."  United States v.

Eppolito, 436 F. Supp. 2d at 578.  This detail alone might have

alerted plaintiffs to the possibility of a claim against the

City.[3]  Moreover, publicity surrounding the indictment further

detailed Caracappa and Eppolito's history of corruption

allegations and the City's knowledge of this history.  For

example, one newspaper article submitted by defendants, dated

---

[2] City defendants explain that Caracappa and Eppolito's trial
began March 6, 2006.  See City Defs.' Mem. Sup. Mot. J.
Pleadings, at 10.  Caracappa and Eppolito were convicted April
6, 2006.  Notice of Claim at 2.

[3] Indeed, as noted supra, plaintiffs filed a notice of claim
against the City in July 2006, alleging City liability for
Caracappa and Eppolito's actions on a theory of agency.
Although this Notice of Claim does not conclusively establish
that plaintiff's knew at this time of the City "policy" of
failing to restrict the access of allegedly corrupt detectives
to confidential databases, it certainly reinforces the
conclusion that plaintiffs knew enough underlying facts to at
least begin investigating City policies long before they allege
they "first learned" of their claim in March 2009.

March 11, 2005 – the day after the indictment – explains that
the investigation of the detectives had revealed "logs detailing
corruption allegations against the detectives over the years,"
and that "a paper trail of computer records emerged that showed
Caracappa . . . had grossly abused his position . . . ."  Defs.'
App. (Daily News article entitled 2 Cops Who Killed for Mafia).
Additional articles submitted by City defendants, also dating
from the time of the indictment, included further facts that
would point to the existence of a possible Monell claim against
the City.  See, e.g., William K. Rashbaum, Detectives Used
Badges to Kill For the Mob, Indictments Say, N.Y. Times, March
11, 2005 (chronicling previous corruption investigations of the
detectives and explaining Eppolito's history of ties to
organized crime, including charges of corruption brought against
him in 1985); Sean Gardiner et al., Once, They Were 'Wise Guys
Experts', Newsday, March 11, 2005 ("Eppolito's career was
sidetracked in 1984 [when] he was suspended after being charged
administratively with copying reports and photos from the NYPD's
Intelligence Division and giving them to Rosario Gambino, the
nephew of Carlo Gambino, a reputed leader of the Gambino crime
family. . . . [H]is reputation on the force never fully
recovered.") (included in Defs.' App.).

    These facts are the same ones upon which plaintiffs now
base their theory of the City's § 1983 liability.  It is thus

irrelevant whether the trial, or information emerging post-
trial, may have contributed more facts, or better facts, to
support a theory of the City's liability.  The record makes
clear that at the time of the indictment in March 2005, the
basic facts underlying plaintiffs' current Monell claim were –
if not actually known to plaintiffs – easily discoverable, and
thus the claim accrued at this time.  See Pearl, 296 F.3d at 85
(finding that knowledge of the basic facts underlying a § 1983
cause of action triggers accrual, even if a plaintiff obtains
far more persuasive evidence later on); Paige, 264 F.3d at 199-
200 (finding that later-discovered corroborating facts did not
excuse plaintiff from pursuing her claim earlier when she at
least knew of her injury); Guccione v. United States, 670 F.
Supp. 527, 534 (S.D.N.Y. 1987) (finding the plaintiff's claim
untimely because "extensive press coverage" should have alerted
the plaintiff to the existence of his claim years earlier).

Accordingly, plaintiffs' § 1983 claims accrued in March
2005, when they "at least had reason to come to know about" the
basis of their claims against the City, and therefore these
claims should have been brought by March 2008.  See Pinaud, 52
F.3d at 1157 (finding that "the application of a delayed accrual
theory" did not aid Pinaud because he "knew about, or at least
had reason to come to know about, the policy or custom" more
than three years before he brought his claim).  It is

unfortunate that plaintiffs did not find a lawyer who could
apprise them of the particular legal theory they are now
pursuing until March 2009, but a plaintiff is not excused from
bringing suit until she knows of the precise legal theory
underlying her claim.  See Pearl, 296 F.3d at 85.

Furthermore, plaintiffs' claims are not rendered timely by
equitable tolling.  The Second Circuit recognizes equitable
tolling in § 1983 actions when a plaintiff is prevented from
discovering her claim due to fraudulent concealment on the part
of the defendant.[4]  See Pinaud, 52 F.3d at 1157; see also Pearl,
296 F.3d at 82.  In that situation, the statute of limitations
"does not begin running until the plaintiff discovers, or by the
exercise of reasonable diligence should have discovered, the
cause of action."  Keating v. Carey, 706 F.2d 377, 382 (2d Cir.
1983).  "To take advantage of this doctrine, however, a plaintiff
must submit non-conclusory evidence of a conspiracy or other
fraudulent wrong which precluded his possible discovery of the

---

[4] As Pearl recognized, the concepts of accrual and equitable
tolling are not as distinct as some courts make them out to be.
Whether a claim is considered not to have accrued because it
could not have been discovered, or instead is considered to have
"in some sense accrued earlier" but to merit equitable tolling,
is often a matter of semantics.  See Pearl, 296 F.3d at 80-82.
In any event, these labels make no difference to plaintiffs
here, as under either federal accrual rules or the doctrine of
equitable tolling, their claims should have been brought within
three years of Carracapa and Eppolito's indictment.

harms that he suffered."  Pinaud, 52 F.3d at 1157 (emphasis omitted).

Plaintiffs have not submitted any evidence that the City was engaged in a conspiracy to conceal their potential cause of action against it.  On the other hand, perhaps a case could be made that defendants Eppolito and Caracappa were essentially engaged in a conspiracy to conceal any possible causes of action their victims' families might have.  However, even if it were assumed that this might be enough to grant plaintiffs some relief under the doctrine of equitable tolling, this relief would again only extend until the time of Caracappa and Eppolito's indictments.  At that point, as explained above, plaintiffs had available sufficient information such that "by the exercise of reasonable diligence," they should have discovered their cause of action.  See Keating, 706 F.2d at 382; see also Pinaud ("[E]ven if we were to conclude that Pinaud had sufficiently alleged a conspiracy that served fraudulently to conceal the County of Suffolk's wrongs against him, he has not indicated why 'by the exercise of reasonable diligence' he was only able to 'discover' the wrongs against him [several years later].").

Accordingly, the City is correct that the three year statute of limitations applicable to § 1983 actions in New York

acts as a bar to plaintiffs' federal claims, which must be
dismissed on this ground.


## (4)

## State Law Claims

The City has also moved to dismiss plaintiffs' state law
claims of wrongful death and negligent injury against it,
arguing that these claims must be dismissed for failure to
comply with N.Y. Gen. Mun. Law §§ 50-e and 50-e.[5] These two
statutory provisions combine to require any plaintiff who wishes
to bring certain tort claims against a city: (1) to file a
notice of claim with the city within ninety days after the claim
arises; and (2) to bring suit within one year and ninety days of
the event giving rise to the claim, or within two years for
wrongful death claims.  See N.Y. Gen. Mun. Law §§ 50-i, 50-e
(McKinney's 2010).[6] Failure to comply with these rules requires

---

[5] The City also argues that plaintiffs have waived their state
law claims by failing to address them in their opposition
papers.  Although courts have the discretion to dismiss claims
on this ground, see Local Civ. R. 7.1(a) (2009), this contention
will not be addressed here, since plaintiffs' claims are found
to be deficient for more substantive reasons.

[6] N.Y. Gen. Mun. Law § 50-i reads, in relevant part:

> No action . . . shall be prosecuted or maintained
> against a city . . . unless a notice of claim
> shall have been made and served upon the city . .
> . in compliance with section fifty-e of this

dismissal.  See, e.g., Jean v. City of New York, No. 08-CV-
00157, 2009 WL 3459469, at *10 (E.D.N.Y. Oct. 22, 2009)
(dismissing state law claims because plaintiff failed to file a
notice of claim, which is required even when bringing state law
claims in federal court); see also Hardy v. New York City Health
& Hosps. Corp., 164 F.3d 789, 793-94 (2d Cir. 1999).

Here, even giving plaintiffs every generosity that New York
law might accord them, their failure to comply with the New York
notice of claim rules requires dismissal.  Plaintiffs filed
their Notice of Claim on July 3, 2006, alleging that their claim
arose on April 6, 2006, when Eppolito and Caracappa were
convicted for their roles in the murder of Bruno.  Notice of
Claim at 2.  Based on the information available to plaintiffs at
the time of Eppolito and Caracappa's indictment, it is doubtful
that their claims against the City arose only as of Eppolito and
Caracappa's conviction.  However, even if their claim were
deemed to have arisen April 6, 2006, or the statute were tolled

---

                    chapter . . . and the action . . . shall be
                    commenced within one year and ninety days after
                    the happening of the event upon which the claim
                    is based; except that wrongful death actions
                    shall be commenced within two years after the
                    happening of the death.

N.Y. Gen. Mun. Law § 50-e, in turn, provides: "In any case
founded upon tort where a notice of claim is required . . .
the notice of claim shall comply with and be served in
accordance with the provisions of this section within
ninety days after the claim arises . . . ."

until this time, it would not avail plaintiffs.  Plaintiffs still did not take action until March 31, 2009, which is well beyond the one year and ninety day time requirement of § 50-i (and well beyond the two year requirement § 50-i imposes for wrongful death actions as well).  Cf. Cally v. New York Hosp. Medical Ctr. of Queens, 14 A.D.3d 640, 641, 788 N.Y.S.2d 620, 621 (2d Dep't 2005) (affirming dismissal of causes of action brought against the City as time-barred because "those causes of action accrued more than one year and 90 days before the commencement of the action").

Thus, based on a failure to comply with N.Y. Gen. Mun. Law § 50-i, plaintiffs' state law claims against the City must also be dismissed.


## Conclusion

For the reasons stated above, City defendants' motion for summary judgment is granted in its entirety.


Dated: Brooklyn, New York
       August 6, 2010

                              SO ORDERED:

                              _____
                                          /s/
                              David G. Trager
                              United States District Judge

22